# EXHIBIT J

Transcript of the Testimony of

**Joshua Bray**
March 16, 2017

**Lankford v. City of Pullman**
No. 2:16-cv-00377-SMJ



**Court Reporters/Video/Videoconferencing**
**Seattle/Tacoma, Washington**

scheduling@byersanderson.com
www.byersanderson.com

One Union Square: 600 University Street, Suite 2300 Seattle, WA 98101-4128
Seattle: **206 340-1316**  Toll Free: **800 649-2034**
Old Town District: 2208 North 30th Street, Suite 202 Tacoma, WA 98403-3360
Tacoma: **253 627-6401**  Fax: **253 383-4884**

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON AT SPOKANE


TYLER JAMES THOMAS LANKFORD,      )
                                  )
              Plaintiff,          )
                                  )
        vs.                       ) No. 2:16-cv-00377-SMJ
                                  )
CITY OF PULLMAN; OFFICER JOSHUA   )
BRAY; OFFICER ALEX GORDON;        )
DETECTIVE TODD DOW; OFFICER GREG  )
UMBRIGHT; DOES I-X,               )
                                  )
              Defendants.         )


VIDEOTAPED DEPOSITION OF JOSHUA BRAY

February 16, 2017

Pullman, Washington




Byers & Anderson, Inc.

Court Reporters/Video/Videoconferencing


One Union Square      2208 North 30th Street, Suite 202
600 University St.    Tacoma, WA 98403
Suite 2300            (253) 627-6401
Seattle, WA 98101     (253) 383-4884 Fax
(206) 340-1316        scheduling@byersanderson.com
(800) 649-2034        www.byersanderson.com


Serving Washington's Legal Community since 1980

Page 6

```
 1     Joshua Bray being taken on behalf of the plaintiff in

 2     the case of Tyler James Thomas Lankford versus the City

 3     of Pullman.  The cause number is 2:16-cv-00377-SMJ.

 4        This deposition is being held at the Pullman Police

 5     Department at 260 Southeast Kamiaken Street in Pullman,

 6     Washington.

 7        And will the attorneys please introduce themselves

 8     for the record?

 9                    MR. PARKER:  Yes.  Darryl Parker

10     appearing on behalf of the plaintiff.

11                    MR. KERLEY:  Chris Kerley on behalf

12     of the defendants.

13                    THE VIDEOGRAPHER:  Okay.  The court

14     reporter today is Leigh Delmond.

15        Please swear in the witness and proceed with the

16     deposition.

17

18                      <<<<<< >>>>>>

19

20     JOSHUA BRAY,          having been first duly sworn

21                           by the Certified Court Reporter,

22                           testified as follows:

23

24

25
```

**Byers & Anderson Court Reporters/Video/Videoconferencing**
**Seattle/Tacoma, Washington**

```
 1                          EXAMINATION
 2      BY MR. PARKER:
 3   Q  Good morning --
 4   A  Good morning.
 5   Q  -- Joshua Bray.  You're still a police officer with the
 6      City of Pullman?
 7   A  Yes.
 8   Q  Have you ever had your deposition taken before?
 9   A  Nope.
10   Q  Okay.  Well, I'm going to be asking you some questions
11      about some events that happened probably a while ago so
12      you may have to refer to documents to --
13   A  Okay.
14   Q  -- refresh your recollection and that's perfectly fine.
15          The oath that you just took is the same oath that
16      you would take as if you were testifying in court in
17      front of a judge and a jury.  Do you understand that?
18   A  I do.
19   Q  And one of the ways that we use a deposition is that we
20      get your information today and if you testify
21      differently at trial, we can compare how you testify at
22      trial to how you testify today.  Do you understand that?
23   A  Uh-huh.
24   Q  "Yes"?
25   A  Yes.
```

```
 1   Q   When did that happen?

 2   A   Let's see -- it would have been September 18th, 15th,

 3       somewhere in there.

 4   Q   Of 2000 --

 5   A   2015, yes.

 6   Q   So when -- the incident that brings us here today, you

 7       were being -- you were still in phase three when the

 8       incident happened?

 9   A   I think I was a week or two into phase three.

10   Q   And prior to the incident involving Tyler Lankford, had

11       you ever completed an affidavit for a search warrant?

12   A   No.

13   Q   Had you ever practiced writing an affidavit for a search

14       warrant?

15   A   No.

16   Q   So when you -- strike the question.

17           What training did you rely on in drafting a search

18       warrant?

19   A   The training I relied on was probable cause.  Being able

20       to -- to take what we had from all the information

21       presented to us and the totality of circumstances, but

22       drafting -- putting together a search warrant the

23       correct way was assisted.

24   Q   For example, at some point someone had to teach you what

25       you put into an affidavit for a search warrant, correct?
```

Page 14

1    A    Right.

2    Q    And who did that?

3    A    That day, it would have been Officer Mike Crow.

4    Q    Mike Crow?

5    A    Yes.

6    Q    Like the bird?

7    A    Yes.

8    Q    And what's his position other than an officer with the

9         Pullman Police Department?

10   A    He's just a senior police officer/former

11        detective/former FTO.

12   Q    And when did he teach you what the elements were for a

13        search warrant?

14                      MR. KERLEY:   Object to the form.   It

15        assumes facts.

16           You can go ahead and answer.

17                      THE WITNESS:   Oh, that morning while

18        I was putting together the search warrant.

19        BY MR. PARKER:

20   Q    Other than Mike Crow teaching you or assisting you in

21        putting together the search warrant, did you have any

22        training after the academy on what the elements are for

23        an affidavit for a search warrant?

24   A    Just in the classroom just at the academy.   It was

25        talking, no physical -- I never participated in a

Page 15

1    practice search warrant or a practice affidavit so the

2    writing of it was...

3  Q  New?

4  A  Yeah, new to me.

5  Q  So at the police academy when you're being taught about

6    search and seizure law, the Fourth Amendment, is it

7    accurate to say that at no time were you given a test

8    where you had to actually write an affidavit for a

9    search warrant at the police academy?

10 A  The class did.  I personally was not a part of that

11   exercise.

12 Q  And why was that?

13 A  I had a different role.  During that full day that we

14   did in the academy it was a crime scene where we

15   gathered facts, took evidence, and put together a search

16   warrant.

17       There was a group of people that did the search

18   warrant and there was a group of people that did the

19   crime scene.  My role that day was photography of -- of

20   the actual crime scene.

21 Q  As a technician or were you just videotaping it for

22   training purposes?

23 A  For training purposes I took -- we worked on how you

24   take photos of evidence and it was applying that

25   knowledge that was my role that day.

Page 16

```
1   Q   And so were there any subsequent days where you had the

2       opportunity to be one of the cadets who wrote the

3       affidavit?

4   A   Not that I recall.

5   Q   Okay.  And did you write a draft of the affidavit for

6       the search warrant in the Tyler Lankford case that was

7       edited by anybody?

8   A   I would have been the only one that edited it.

9   Q   Well, when I -- well, let me change the question.  Did

10      you write a draft of a search warrant and then alter the

11      search warrant based on -- strike that.

12          Did you alter the affidavit for the search warrant

13      based on information or critique from somebody else?

14  A   I don't recall exactly how it was written.  You know,

15      that was in July of 2015, but what I do know and what I

16      do recall is Officer Crow was with me and assisted me.

17          I can't for sure say that -- I know for sure he

18      didn't put anything into that affidavit, but the

19      structure of it was all -- 100 percent assisted.

20  Q   Did you create the affidavit for the search warrant here

21      at the Pullman Police Department?

22  A   Yes.

23  Q   Did you use a computer?

24  A   Yes.

25  Q   Did you use a template where you were altering a
```

Page 23

```
 1      counsel?
 2   A  Other than counsel?  No.
 3   Q  Is the affidavit that you wrote for the search warrant
 4      accurate?
 5   A  Yes.
 6   Q  I want to direct your attention to the very first
 7      paragraph --
 8   A  Okay.
 9   Q  -- beginning with the word "that."  Can you read that
10      into the record?
11   A  You want me to read the paragraph?
12   Q  Yes.
13   A  "That on or about the 26th day of July, 2015, in Whitman
14      County, Washington, a crime to wit felony harassment was
15      committed upon the person or property of Mikaela Marlow
16      and the following evidence is material to the
17      investigation of said case."
18          Do you want me to read the whole thing?
19   Q  Well, you can read your first two items there.
20   A  "Any and all firearms to include, but not limited to, a
21      9mm Glock and a 40mm Smith & Wesson.  Any and all
22      ammunition."
23   Q  All right.  Let's start with the first paragraph.
24   A  Okay.
25   Q  What information do you have that on July 26, 2015, that
```

Page 24

1      the crime of felony harassment was committed against the

2      person or property of Mikaela Marlow?

3   A  On the 26th we had the recordings from the -- Lankford's

4      aunt, we had e-mails -- that wouldn't have been Mikaela

5      Marlow, that was something else, but we did have the --

6      the recording that I listened to on the 27th.

7   Q  And what did that recording say that led you to believe

8      that the crime of felony harassment had been committed

9      against Mikaela Marlow?

10  A  At the time when we listened to it -- I have not heard

11     it since then, but the -- I'm trying to think.

12        I mean, he said that -- I know that word for word

13     was he wanted to go find his U of I professor at the

14     U of I and give him a piece of his mind.

15        I believe -- is that the correct wording?

16  Q  And he said he wanted to give "him" a piece of his mind?

17  A  Her.

18  Q  Her?

19  A  Yes.

20  Q  And how do you know that?

21  A  Because that's what I heard.

22  Q  How do you know it was Mikaela Marlow?

23  A  We had to do some investigating to find out if this

24     U of I professor was a -- was it a threat?  Was it a

25     random U of I professor?

1        We used Spillman and found that there was a

2    threatening case involving Lankford and this U of I

3    professor.

4   Q   Any other facts other than what you just told me today?

5                    MR. KERLEY:  Object to the form.

6                    MR. PARKER:  I'll rephrase the

7       question.

8       BY MR. PARKER:

9   Q   Are you telling me that what you just told me is what

10      you based the first paragraph of your affidavit for a

11      search warrant on?

12  A   No.

13  Q   Anything else?

14  A   The weapons and the ammunition, is that what you're

15      referring to?

16  Q   It's not and maybe I confused you.  Just focus on the

17      first three lines beginning with "that" and ending with

18      "case."

19          You're stating that the crime of felony harassment

20      was committed on the person of Mikaela Marlow on the

21      26th of July 2015.  Do you see that?

22  A   I do.

23  Q   And I want to know all the facts that you had at the

24      time that allowed you to make that statement.

25  A   All the facts at the time when I put this case together?

```
 1   Q    Right.  All the facts that allowed you to make that

 2        statement that --

 3                    MR. KERLEY:  Counsel, I'm sorry.  I'm

 4        confused by the question.  Are you asking about facts he

 5        had independent of what's in the exhibit or --

 6                    MR. PARKER:  No.

 7                    MR. KERLEY:  -- what's in the

 8        exhibit?

 9                    MR. PARKER:  I don't care what's in

10        the exhibit.

11        BY MR. PARKER:

12   Q    If you need to refer to the exhibit to refresh your

13        recollection, please do.

14          I want to know all the facts that you had to

15        demonstrate that on July 26, 2515, the crime of felony

16        harassment was committed against Mikaela Marlow.

17                    MR. KERLEY:  And you can refer to the

18        rest of the exhibit, if you need to.

19                    THE WITNESS:  I -- I do know that I

20        failed to put in the conversation that we had -- or not

21        that I had, that Officer Breshears had with Mikaela

22        Marlow.

23          I personally never talked to Mikaela Marlow,

24        Officer Breshears did, which is a -- which was the

25        officer in charge that day.  I do believe that he
```

Page 27

 1    gathered enough probable cause for harassment on her.

 2        So if you're asking me what I had specifically on

 3    Mikaela Marlow on the 26th, it was the recording, we

 4    identified the U of I professor as Mikaela Marlow, and

 5    Officer Breshears then took over that interview and he

 6    interviewed Marlow.

 7        The only two people I interviewed was Bailey and

 8    Finch, the mother and aunt.

 9  Q  You wrote this affidavit?

10  A  Yes.

11  Q  On July 27, 2015?

12  A  Correct.

13  Q  At the time that you wrote the affidavit other than the

14    "I want to give a UI professor a piece of my mind," what

15    other information whether it's because you got it from

16    someone else or you got it by hearsay -- what other

17    information did you have that the crime of felony

18    harassment had been committed against Mikaela Marlow on

19    the 26th of July 2015?

20            MR. KERLEY:  And again, I want to

21    make sure you understand the --

22            THE WITNESS:  Yeah.

23            MR. KERLEY:  -- question, Officer.

24    Are you -- he's asking about all of the information that

25    you had including everything that you recited in your

Page 28

```
1       affidavit.

2                    THE WITNESS:  Okay.

3          So you're asking -- I had interviews with Lynch and

4       Bailey, I had a recording.

5       BY MR. PARKER:

6    Q  Right.  But I want to know the factual information.  You

7       interviewed Lynch, what information did you get from

8       Lynch?

9          You interviewed Bailey, what information did you

10      get from Bailey that allowed you to make the statement

11      that you made in the beginning of your affidavit?

12   A  That I recall from my reports and reading my affidavit,

13      that recording, the factual information of him talking

14      about running amok -- I know that's not specific to

15      Mikaela Marlow -- delusional thoughts.

16         The -- that he has firearms and that they do

17      believe that he's going to carry out these threats that

18      he wanted to go find his U of I professor, and Officer

19      Breshears' interview.

20   Q  How do you know he wanted to go find his U of I

21      professor?

22   A  Based on the recording and based on what Lynch told me.

23   Q  Anything else?

24   A  I can't say that there is anything else.

25   Q  Did Lynch tell you that he wanted to go find Mikaela
```

Joshua Bray
March 16, 2017

1      Marlow?

2    A  Lynch did -- I don't know if she told me directly.  I do

3      know that it was said on the -- on the recording, I

4      believe.  And again, I haven't heard that recording

5      since that day.

6    Q  Well, as you sit here today, you believe there's a

7      recording that you've heard where you hear a male voice

8      say, "I want to give a UI professor a piece of my mind"?

9    A  I believe there is.

10   Q  Did you ever hear such a recording?

11   A  I heard a recording over the -- the phone.

12   Q  Did you ever hear a recording over the phone or in

13     person where you heard a male voice say, "I want to find

14     my UI professor and give him or her a piece of my mind"?

15   A  I -- I believe so.  I cannot recall off the top of my

16     head if that was on the recording or if that was given

17     to me by Lynch.

18   Q  All right.

19   A  I do know that that -- those words, I did hear.  I would

20     have to listen to the recording and go -- I don't have

21     that.  I haven't listened to it.

22   Q  Okay.  And so you did not listen to any of the

23     recordings in preparation for your deposition?

24   A  No.

25   Q  And the last time you listened to the recordings was

Page 30

```
1        when?

2    A   It would have been either July 27th or July 28th as I'm

3        writing my report.

4    Q   And when did you conclude that Marla -- Mikaela Marlow

5        was the victim of felony harassment?

6    A   From Officer Breshears.

7    Q   Right.  I want to know when.

8    A   When?

9    Q   Yes.

10   A   It was in between my interviews of Lynch and Bailey.  I

11       had a discussion with them -- the first interview?

12   Q   Yeah.

13   A   He went into Spillman and found a case, he notified me,

14       he contacted Marlow.

15   Q   So are you saying that at the time you wrote your

16       affidavit Marla -- Mikaela Marlow had not complained

17       that someone had been harassing her?

18   A   No, but we do have a duty to contact her to see if she

19       -- if this threat is probable.

20   Q   Well, that's not my question.  My question is:  Had she

21       complained to you --

22   A   She had not complained.

23   Q   Let me get the question out.  This is --

24   A   Okay.  I'm sorry.

25   Q   -- being recorded.  Mikaela Marlow had not complained to
```

1      you that she was being harassed at the time you wrote

2      your affidavit for the search warrant?

3   A  No.

4   Q  And you said that Officer Breshears --

5   A  Uh-huh.

6   Q  -- contacted Mikaela Marlow?

7   A  Correct.

8   Q  And when did he do that?

9   A  That day on July 27, 2015, during the exact time I was

10     -- I was in a different room interviewing the other two

11     complainants.

12  Q  I'll ask the question another way.  Did Officer

13     Breshears tell you he had contacted Mikaela Marlow prior

14     to you writing your affidavit for the search warrant?

15  A  Yes.

16  Q  And had -- did you get any information that Mikaela

17     Marlow had heard from Tyler Lankford at any time after

18     he left her class?

19  A  No.

20  Q  Take a look at Exhibit 4 again --

21  A  Okay.

22  Q  -- and read Section 1 into the record, please.

23  A  "A person is guilty of harassment if:

24        "(a) Without lawful authority the person knowingly

25     threatens:

Page 35

1    Q    You believed you were going to -- did you believe that a

2         crime of felony harassment was committed using firearms?

3    A    Do I believe that harassment and firearms...

4    Q    No, just listen to my question.  Do you believe that the

5         crime of felony harassment was committed by Tyler

6         Lankford against Mikaela Marlow using firearms?

7    A    I don't understand your question.  That -- I do know

8         that the firearms were a concern of everybody.

9             The statements made to Marlow and him having

10        firearms gives us reason to believe that he has the

11        means to carry out those threats, so the firearms, yes.

12   Q    The question I'm asking you is:  Do you believe that

13        firearms were used to commit the crime of felony

14        harassment against Mikaela Marlow?

15   A    They were not used, no.

16   Q    Have you ever heard of relying on informants in drafting

17        an affidavit for a search warrant?

18   A    No.

19   Q    You've never heard of that before?

20   A    No.  Relying on -- I've never dealt with informants.

21        I've never had that training or experience.

22   Q    Did you consider Lynch to be an informant?

23   A    In my mind, she was a reporting party.

24   Q    Did you know her?

25   A    I did not know her.

Page 36

1   Q   Did you know anything about her?

2   A   Nope.

3   Q   Does she have a college education?

4   A   I don't know.  Everybody I talked to, I don't know.  I

5       do know the things I know about them, that's about all I

6       could say.

7           I don't -- I don't get into personal relationships

8       with people that are reporting something.

9   Q   Let me narrow it a little --

10  A   Okay.

11  Q   -- more.  Did you ask Lynch about her background?

12  A   The fact that -- the only thing I asked is how she's

13      concerned with Lankford and she's her aunt and Lankford

14      was staying with her, that's it.

15  Q   Did you know anything about her background before

16      interviewing her?

17  A   No.

18  Q   So for all you knew she could be a mental -- mentally

19      ill person?

20  A   Sure.

21  Q   Did you know her reputation for honesty?

22  A   No.

23  Q   Did you know that she was actually related to Tyler

24      Lankford?

25  A   Just on the information that she's given.

**Byers & Anderson Court Reporters/Video/Videoconferencing**
**Seattle/Tacoma, Washington**

Page 37

1  Q  Just based on what she told you?

2  A  Yeah.

3  Q  So there was nothing about her where you could say that

4     the information that she gave you was trustworthy?

5  A  I had no reason to believe that it's not.

6  Q  Right.  But did you have any information to believe that

7     it was trustworthy?

8  A  I'm not going to say that it's not not trustworthy.  I

9     don't -- I don't know what you're trying to -- how

10    you're trying to get me to answer this but...

11 Q  Well, I just want you to tell the truth.

12 A  I am.

13 Q  Let me give you an example.

14 A  I mean, I don't know you.  I trust you to talk to me and

15    that the stuff that you're telling me is the truth.

16    That's what I had with her.

17 Q  I'll give you an example.

18 A  Okay.

19 Q  Sometimes you know a person and you know their

20    reputation for honesty.

21 A  Correct.

22 Q  Sometimes people have given you information in the past

23    that has been reliable so you consider the person to be

24    a reliable person and sometimes simply by the person's

25    stature in the community, you figure this person is

**Joshua Bray**
**March 16, 2017**

 1      somebody who can be relied on.

 2          That's what I'm asking:  Did you have any

 3      information about anybody who was giving you information

 4      that you could rely on based on your knowledge of that

 5      person?

 6   A  Okay.  I think I understand your question now, and it

 7      would be no.

 8   Q  Okay.  After you drafted your affidavit for your search

 9      warrant, did you have somebody read it and approve it?

10   A  Officer Crow was here, he read it.  He was with me when

11      I sent it.  I can't recall exactly the process of that

12      -- that Officer Crow did in reading it.

13   Q  Did Officer Crow ask you any questions about your

14      affidavit?

15   A  I don't recall him asking any questions.  He had no

16      knowledge of the case itself, but he is -- he was and is

17      very experienced in search warrants and affidavits.

18   Q  But as you sit here today, you don't recall Officer Crow

19      asking you any questions?

20   A  I actually do not recall the conversation that went on

21      with me and Crow during this affidavit.

22   Q  Did you ask anybody else whether or not the affidavit

23      was sufficient for getting a search warrant?

24   A  I don't believe so.

25   Q  And so you got the affidavit, you signed the affidavit,

**Byers & Anderson Court Reporters/Video/Videoconferencing**
**Seattle/Tacoma, Washington**

Page 40

```
 1   Q   Yes.

 2   A   I had three people providing me information.

 3   Q   Who -- who were the three people?

 4   A   Are you talking about for the affidavit?

 5   Q   The information that you relied on to draft the

 6       affidavit, who are the people that provided you with

 7       that information?

 8   A   Lynch, Bailey, and Marlow through Breshears.  So Lynch,

 9       Bailey, and Marlow.

10   Q   And what's Lynch's first name?

11   A   I believe it is Kathleen Lynch.

12   Q   Do you know what Kathleen Lynch's relationship is to

13       Tyler Lankford?

14   A   She is his aunt.

15   Q   And you know that because she's told you?

16   A   Yes.

17   Q   And what's Bailey's first name?

18   A   Sherry.

19   Q   And what's her relationship to Tyler Lankford?

20   A   She said his mother.

21   Q   And you asked his mother whether or not she thought that

22       Tyler Lankford was making threats, correct?

23   A   Not making threats, she was a reporting party the

24       previous day on a welfare check.  She did give us

25       information on kind of his background, but she didn't
```

Page 41

1     state -- I don't believe she stated any threats.

2  Q  But you did ask her, right, had Tyler Lankford made any

3     threats?

4  A  I don't recall that -- that exact question.

5  Q  Did you ask Kathleen Lynch whether Tyler Lankford had

6     made threats?

7  A  She had told me and then I asked from there, yes.

8  Q  Did you ask her who he made the threats to?

9  A  Yes.

10 Q  And she never answered your question, right?

11 A  That -- what she gave me was -- I guess she said he made

12    "concerning statements."

13 Q  Right.  But you specifically asked her, "Did he make

14    threats?"  And she never answered your question, right?

15 A  I -- I -- specifically, "Did he make any threats"?  I

16    don't know that -- if I asked that question.

17 Q  Did she ever tell you that he had made specific threats?

18 A  He had -- no, not that I recall.

19 Q  Had -- had you ever heard of the Philippine custom of

20    "running amok"?

21 A  I had not.

22 Q  Have you ever heard of anybody using the phrase "run

23    amok" or "running amok" prior to this incident?

24 A  I believe I had heard it in casual -- I never knew the

25    meaning behind it.

**Byers & Anderson Court Reporters/Video/Videoconferencing**
**Seattle/Tacoma, Washington**

Page 44

1       team.  He is a member of the SWAT team.

2              So the affidavit -- well, I'll let you...

3   Q   Well, I'm just trying to figure out why you wrote the

4       affidavit at all.  You know, did somebody suggest to you

5       that you write an affidavit for a search warrant?

6   A   Well, I do know that when you apply for a search warrant

7       an affidavit goes with your search warrant, that I

8       learned through training.

9   Q   Right.  But why were you applying for a search warrant

10      at all?

11  A   Based on what I wrote into the search warrant.

12  Q   Contemporaneously with you applying for the search

13      warrant, there was a SWAT team descending upon the hotel

14      where you believed Tyler Lankford was staying?

15  A   Uh-huh.

16  Q   Correct?

17  A   Correct.

18  Q   So why do you need the affidavit for the -- why do you

19      need a search warrant at all?

20  A   Because we can't go into a hotel room without a search

21      warrant.

22  Q   Did you apply for the search warrant so that you could

23      gain access to the hotel room?

24  A   Yes.

25  Q   So at the time the SWAT team was descending upon the

Page 45

```
 1        hotel room, you believe that the SWAT team did not have

 2        the authority to enter the hotel room?

 3    A   Nope, they were waiting on the search warrant to be

 4        completed.

 5    Q   And Tyler Lankford came out of the hotel room, to your

 6        understanding --

 7    A   To my understanding --

 8    Q   -- before you got the search warrant?

 9    A   -- correct.

10    Q   And he was taken into custody before you got the search

11        warrant?

12    A   I -- before I got it?  I don't -- I don't know.  I can't

13        remember the -- the exact time that I received it.

14    Q   When the search warrant was executed on, Tyler Lankford

15        was already --

16    A   Yes.

17    Q   -- removed from the premises?

18    A   Correct.

19    Q   And what was your purpose of having the search warrant

20        executed after he had already been removed from the

21        premises?

22    A   To execute the search warrant?

23    Q   Yeah.

24    A   Well, our evidence of crime would have been what I put

25        in here, the firearms and ammunition.
```

**Joshua Bray**
**March 16, 2017**

1    A    **It just has the crime -- the probable cause for the**
2         **crime that was committed and in this case we -- we had**
3         **harassment.**
4    Q    So it was your plan to book Mr. Lankford on charges of
5         felony harassment when you went to the hospital that
6         day?
7    A    **We didn't know how -- we did have probable cause for a**
8         **crime.**
9    Q    Right.  But was it your plan to book Mr. Lankford for
10        the crime of felony harassment the same day that you
11        took him to the -- or that he was taken to the hospital?
12   A    **I -- I don't know that that was our plan.  Our plan was**
13        **that Lankford get the help he needed, which is why he**
14        **was at the hospital.**
15   Q    Maybe I'm just asking bad questions.  The PC booking
16        sheet -- is the purpose of the PC booking sheet to
17        arrest somebody and book them into jail?
18   A    **It -- it is what we take to Whitman County Jail when we**
19        **arrest somebody.**
20   Q    And so were you planning to arrest Tyler Lankford that
21        day?
22   A    **We were planning to arrest him.**
23   Q    And he wasn't arrested that day because he was on a
24        psychiatric hold?
25   A    **Yes.**

Page 55

1   Q   So absent the psychiatric hold, you would have arrested

2       him and booked him into the Whitman County Jail?

3   A   Correct.

4   Q   For the charge of felony harassment?

5   A   Correct.

6   Q   And -- and you believe you had probable cause for that

7       arrest?

8   A   Correct.

9   Q   Did you believe at the time you had probable cause for

10      any other arrest -- arrests for anything else?

11  A   At that time?

12  Q   Yeah.

13  A   I -- I personally did not.

14  Q   Okay.  So did you ask Tyler Lankford any questions?

15  A   No.

16  Q   Were you present when he was asked any questions?

17  A   No.

18  Q   Did he ever refuse to speak to you?

19  A   Yes.

20  Q   When was that?

21  A   When the hospital released him -- I believe it was on

22      the 28th -- I read him his Miranda rights and he chose

23      not to speak to me.

24  Q   So you were at the hospital on the 27th and the 28th?

25  A   Correct.

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

Page 61

```
 1   A    No.

 2   Q    And then what happens next with respect to Tyler

 3        Lankford and your involvement?

 4   A    What happens next is they eventually release him and I

 5        arrested him.

 6   Q    And then what did you do?

 7   A    I transported him back here to Pullman holding.

 8   Q    And then?

 9   A    And then I was done.  I was on overtime and another

10        officer transported him --

11   Q    What --

12   A    -- to Whitman County.

13   Q    What was the work shift that you had in July of 2015?

14   A    It was day shift, 7:00 a.m. to 4:00 p.m.

15   Q    But how many days a week did you work?

16   A    It depends on the week.  We work nine hour days so one

17        week we work four days and one week we work five.

18   Q    Okay.  The actual recordings of conversations between

19        Kathleen Lynch and Tyler Lankford, did you ever get

20        those?

21   A    I did not.

22   Q    Have you ever listened to them yourself?

23   A    Just that day.

24   Q    You're confusing me.  Did you listen to the recordings

25        themselves or did you listen to the recordings through
```

Page 62

```
 1        the telephone?
 2    A   Through the telephone.
 3    Q   So what was played for you was what Lynch or Bailey or
 4        Finch or Bailey decided to play, right?
 5    A   Yes.
 6    Q   But they didn't give you the actual telephone
 7        conversation itself?
 8    A   No, they -- the recordings that I heard were over the
 9        phone.
10    Q   And had you ever heard Tyler Lankford's voice before?
11    A   No.
12    Q   How did you know the voice was his?
13    A   That's what Finch told me.
14    Q   But other than Finch --
15    A   Or Lynch, sorry.   Lynch.
16    Q   Is it Lynch or Finch?
17    A   It's Lynch.
18    Q   Okay, that's probably my fault.
19        Other than Lynch telling you that this was Tyler
20        Lankford's voice, you had no way of knowing that was his
21        voice?
22    A   No.
23    Q   So after -- after Tyler Lankford is booked into the
24        Pullman Jail, you turn him over to jail staff?
25    A   After -- I didn't -- are you talking in general
```

**Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington**

Page 98

```
 1    STATE OF WASHINGTON  )    I, Leigh Delmond,
                           ) ss  a certified court reporter
 2    County of Spokane    )    in the State of Washington, do
                                hereby certify:

 3

 4
            That the foregoing deposition of JOSHUA BRAY was taken
 5    before me and completed on February 16, 2017, and thereafter
      was transcribed under my direction; that the deposition is a
 6    full, true and complete transcript of the testimony of said
      witness, including all questions, answers, objections,
 7    motions and exceptions;

 8          That the witness, before examination, was by me duly
      sworn to testify the truth, the whole truth, and nothing but
 9    the truth, and that the witness reserved the right of
      signature;
10
            That I am not a relative, employee, attorney or counsel
11    of any party to this action or relative or employee of any
      such attorney or counsel and that I am not financially
12    interested in the said action or the outcome thereof;

13          That I am herewith securely sealing the said deposition
      and promptly delivering the same to Attorney Darryl Parker.
14
            IN WITNESS WHEREOF, I have hereunto set my signature on
15    the 1st day of March, 2017.

16

17

18

19          _____

            Leigh Delmond, CCR
20          Certified Court Reporter No. 3332
            (Certification expires 12/09/2017.)
21
      Byers & Anderson certifies that court reporting fees,
22    arrangements, terms of payment, costs, and/or services are
      being offered to all parties on equal terms, and that if
23    there is an agreement between Byers & Anderson and/or its
      court reporters and any persons and/or entities involved in
24    this litigation, and/or any third party agreements relevant
      to this litigation, Byers & Anderson shall disclose the
25    agreement to all parties.
```

**Joshua Bray**
**March 16, 2017**