FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Mar 01, 2018

SEAN F. McAVOY, CLERK

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| TYLER JAMES THOMAS LANKFORD, | No.   2:16-CV-00377-SMJ |
| Plaintiff, | ORDER RULING ON SUMMARY JUDGMENT MOTIONS |
| v. | |
| CITY OF PULLMAN; COUNTY OF WHITMAN; STATE OF WASHINGTON; OFFICER JOSHUA BRAY; OFFICER BRIAN CHAMBERLAIN; DETECTIVE TODD DOW; OFFICER ALEX GORDON; SERGEANT SAM SOREM; OFFICER GREG UMBRIGHT; OFFICER JUSTIN DEROSIER; OFFICER MIKE PETLOVANY; and DOES I-X, | |
| Defendants. | |

## INTRODUCTION

The claims at issue in this case arise from events that occurred in July 2015, when law enforcement officers took Tyler Lankford into protective custody for a mental health evaluation, conducted a search of his hotel room based on a warrant later found to be invalid for lack of probable cause, and arrested Lankford for felony harassment.

ORDER RULING ON
SUMMARY JUDGMENT MOTIONS **-** 1

Lankford brings this suit against several Pullman Police Department officers in their individual capacities and the City of Pullman. Lankford alleges claims against the individual officers for First and Fourth Amendment violations pursuant to 42 U.S.C. § 1983; Americans with Disabilities Act (ADA) violations; and state-law trespassing, conversion, malicious prosecution, and false arrest and imprisonment. Lankford also asserts claims against the City of Pullman under § 1983 for failure to train and state law claims under a theory of respondeat superior.

Defendants City of Pullman, Officer Joshua Bray, Officer Brian Chamberlain, Detective Todd Dow, Officer Alex Gordon, Sergeant Sam Sorem, and Officer Greg Umbright move for summary judgment on all of Lankford's claims, ECF No. 65. Lankford moves for summary judgment on his Fourth Amendment claims against the named Pullman Police Department officers, ECF No. 130.

## UNDISPUTED FACTS

**A.** **Initial contact with Lankford's family**

On July 25, 2105, Lankford checked into the Quality Inn & Suites in Pullman, Washington. The next day, Lankford's mother, Sherry Bailey, went to the Pullman Police Department and asked to speak with an officer about her mentally ill son. Sgt. Sorem responded to Bailey in the lobby of the police department and spoke

with her about her concerns. Bailey told Sgt. Sorem that Lankford had schizophrenia, that he possessed firearms, and that he had a warrant out for his arrest in connection with a resisting arrest charge in Texas. Bailey explained that Lankford was very intelligent and had been enrolled in a PhD program at University of Montana until about April 2015 when he dropped out and moved to Texas. She stated that Lankford had recently become aggressive and hostile and she feared he was unraveling. Bailey also indicated that Lankford suffered from delusions and that drug use exacerbated these delusions.

After his conversation with Bailey, Sgt. Sorem called Whitman County senior deputy prosecutor Bill Druffle to discuss their options. It was decided that Pullman police needed to make an effort to contact Lankford.

Sgt. Sorem and four other Pullman Police Department officers—Officers Winegardner, Perez, Dornes, and Cornish—went to the Quality Inn to attempt to contact Lankford. They confirmed with the hotel clerk that Lankford was staying in room 109. Sgt. Sorem knocked on the door, but Lankford did not answer.

The following morning at 11:15 a.m., Lankford's aunt, Kathleen Lynch, called the Pullman Police department to report that she was concerned about conversations she had had with Lankford that morning. Lynch spoke with Officer Bray. Officer Bray was in his final phase of training with the Pullman Police Department and his field training officer at the time was Officer Alex Gordon.

Lynch told Officer Bray that Lankford had made disturbing comments and threats during a phone call the previous day and that morning. She indicated that she had recorded part of her conversation with Lankford and played that recording for Officer Bray over the phone. In the first recording, Lankford told Lynch that he had been experiencing disturbing thoughts and feared that he might be suicidal. Lynch expressed concern that Lankford might use one of his guns to commit suicide, and Lankford listed several ways he could kill himself without a gun. Lankford went on to express that he felt harassed and disrespected by his peers. Lynch stated that she was concerned that Lankford might use one of his guns against a person he perceived as a threat. Lankford responded that, even if guns were illegal, he could still harm or kill another person using a baseball bat, building a mortar with supplies from a hardware store, building his own gun, or building an "area denial weapon" with materials from a hardware store.

Lynch played a second recording for Officer Bray in which Lankford mentioned a practice called "running amok" and said that he believed that should be a part of our society. Lankford explained that running amok was when a young person goes into the streets and guns down citizens.

Lynch reported that Lankford referred to an ex-roommate's boyfriend and said that he would like to "wipe him off the face of the earth." Lynch stated that Lankford also referred to his ex-girlfriend and stated that he "wanted her head."

Lynch told Bray that Lankford stated he had "thoughts of pulling the trigger and watching a cranium explode" when referencing an interaction he had with police officers in Texas. Lynch further related a conversation she had with Lankford on July 25, 2015, in which he mentioned wanting to find his ex-professor at the University of Idaho and "give him a piece of his mind."

**B.    Investigation into threats against University of Idaho professor**

Sgt. Sorem searched in Pullman Police Department's Spillman records and found the following note regarding Lankford: "Officer Safety/220. Admitted to answering the door with a pistol in hand/concealed behind his back Wednesday July 2015:59:35 . . . . Subject paranoid. Afraid of the military and viruses." Sgt. Sorem's shift ended and he clocked out. He did not return to work until the following day, July 27, 2015, at 3:00 p.m.

After his conversation with Lynch, Officer Bray searched for Lankford in the Moscow Police Department's Spillman records. Officer Bray located a case out of Moscow, Idaho involving Lankford and a University of Idaho professor, Mikaela Marlow. The Spillman report indicated that Lankford had been enrolled in one of Marlow's classes in 2011. He interrupted class constantly, questioned every statement Marlow made or the research she conducted and sent confrontational emails to her regarding her research and teaching methods. As the behavior continued, Marlow sent Lankford an email stating that she would bring his conduct

to the attention of the Dean of Students it his behavior did not change. In his reply email, Lankford stated he felt "targeted by hostility" and would "respond appropriately."

At 12:30 p.m., Pullman Police Department Officer Breshears reviewed the Spillman report regarding the threatening case and contacted the victim, Mikaela Marlow. Officer Breshears informed Marlow about the statements Lankford had made to his mother and aunt including that he wanted his girlfriend's head and that he wanted to run amok. Officer Breshears told Marlow that Lankford stated he wanted to find a former University of Idaho professor and give them a piece of his mind. Marlow told Officer Breshears that she was alarmed and Officer Breshears detected from her tone of voice that she was fearful.

Officer Bray contacted Bailey and interviewed her by phone. Bailey indicated that she had been emailing Lankford over the past few days and that they had exchanged emails that morning. Officer Bray asked Bailey to forward some of the emails and she did. In one of the emails, Lankford wrote that he had been resisting thoughts of suicide.

Officer Breshears contacted Marlow again around 1:00 or 2:00 pm and advised her that officers were reasonably sure they had located Lankford. Officer Breshears told Marlow that she would be safe at her residence. Again, Officer

Breshears perceived that Marlow was fearful, but did not ask whether she was afraid.

## C.    SWAT operation taking Lankford into protective custody

Officer Breshears went to the Quality Inn and verified that Lankford was inside his hotel room. Officer Breshears and Officer Gordon conducted a threat assessment and concluded that a SWAT response was the best course of action to make contact with Lankford. Officer Gordon directed the Whitman County Dispatch to begin assembling a SWAT team.

SWAT team members arrived at the Quality Inn at approximately 3:00 p.m. When the SWAT team arrived, Officer Gordon explained the situation to them and provided information packets. Officer Gordon created an incident action plan for the SWAT team including a surround and callout tactic implementing crisis negotiators. The action plan was approved by Officer Tenant.

Lankford spoke with crisis negotiators for approximately one hour. Eventually, he agreed to exit the hotel room and surrender himself into protective custody. When Lankford exited the hotel room, he was placed in handcuffs and informed that he was being taken into protective custody but that he was not under arrest.

Officer Gordon introduced himself to Lankford and explained that he was investigating a criminal case. Officer Gordon advised Lankford of his full Miranda

rights. Lankford indicated that he understood his Miranda rights and invoked his right to remain silent. Officer Winegardner then transported Lankford to Pullman Regional Hospital for a mental health evaluation.

**D.    Search of Lankford's hotel room**

Immediately after Lankford was taken into custody, SWAT officers entered Lankford's hotel room and conducted a brief visual search of the room. Officers did not touch Lankford's belongings or otherwise disturb the hotel room during this search.

At 3:13 p.m., Officer Bray applied for a warrant to search Lankford's hotel room. The basis for the warrant was felony harassment of Mikaela Marlow. Judge Robinson approved the warrant, and Officer Bray received the warrant by email at 5:56 p.m. At 6:06 p.m., Officer Bray went to the Quality Inn with other officers including Officers Gordon and Dow to execute the search warrant. The officers used a master key to open the door. Officers recovered the following evidence:

- A 9 mm Glock 17 semiautomatic handgun in the drawer of the nightstand between the two beds. The handgun was contained in a holster. The handgun had one magazine with 16 rounds, with a maximum capacity of 17 rounds. The gun had one round loaded in the chamber.

- A 308 caliber Remington 700 rifle on the floor of the bed closest to the window. The rifle was unloaded and in a carrying case. The case included cleaning supplies for the rifle as well as 37 rounds of ammunition.

- Four magazines for a Glock 17 next to the miniature refrigerator in the room. Three of the magazines contained 17 rounds and one magazine contained 6 rounds.

- A pillowcase containing what appeared to be a large quantity of usable marijuana.

Officer Bray prepared a probable cause booking sheet that was substantially identical to the probable cause affidavit supporting the warrant. Officer Winegardner examined the probable cause booking sheet and expressed that he did not believe the booking sheet contained sufficient cause for felony harassment. Specifically, he was concerned that the booking sheet did not state that the victim was in fear that the threats would be carried out.

## E.    Lankford's mental health evaluation and arrest

On July 28, 2015, at approximately 7:30 a.m., Bray called the emergency department at Pullman Regional Hospital to check on Lankford. Bray spoke to the clinical coordinator for the hospital, Jaime Tyler, who informed him that they did not have sufficient cause to send Lankford to Eastern State Hospital and they would release him shortly. Bray asked Tyler to call him as soon as they released Lankford.

After speaking to Tyler, Officers Gordon and Bray provided the three emails Lankford sent to Bailey to Pullman Regional to assist in the probable cause evaluation. Tyler stated that Palouse River Counseling would arrive to do one more evaluation. Two Palouse River Counseling clinicians contacted Lankford that night

but determined Lankford needed to stabilize because he had tested positive for drugs in his system and there was a concern those drugs could interfere with the evaluation.

Palouse River counselors Scott Kuhle and Stacy Petit evaluated Lankford at 10:00 a.m. on July 28, 2015. Kuhle and Petit concluded that Lankford had schizotypal personality disorder, but based on the lack of imminence at the time of their evaluation and Lankford's denial of homicidal ideation, they could not detain him. Gordon and Bray spoke to Scott Kuhle of Palouse River Counseling and expressed their concerns regarding Lankford's homicidal and suicidal thoughts. Kuhle stated that Lankford did not meet their criteria to hold him.

Officers Gordon and Bray went to Lankford's room at Pullman Regional Hospital and arrested Lankford for felony harassment at 12:28 on July 28, 2015. Officer Bray placed Lankford in handcuffs and advised him of his Miranda rights. Lankford chose to invoke his rights and speak to a lawyer. Officer Bray escorted Lankford from the emergency room to his patrol car and transported him to the Pullman Police Department holding facility. Lankford was later transported to Whitman County Jail by Officer Heroff and released to Whitman County Jail personnel.

**F.     Motion to suppress**

2          On September 9, 2015, Lankford's defense attorney filed a motion to

3  suppress all evidence discovered during the July 27, 2015 search of Lankford's

4  hotel room. The Whitman County Superior Court found that the warrant was invalid

5  because officers lacked probable cause to support the crime of felony harassment.

6  The Court granted the motion to suppress and dismissed the charges against Mr.

7  Lankford. Lankford spent a total of 44 days in jail.

8                                  **LEGAL STANDARD**

9          Summary judgment is appropriate if the "movant shows that there is no

10  genuine dispute as to any material fact and the movant is entitled to judgment

11  as a matter of law." Fed. R. Civ. P. 56(a). Once a party has moved for summary

12  judgment, the opposing party must point to specific facts establishing that there

13  is a genuine dispute for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

14  If the nonmoving party fails to make such a showing for any of the elements

15  essential to its case for which it bears the burden of proof, the trial court should

16  grant the summary judgment motion. *Id*. at 322. "When the moving party has

17  carried its burden under Rule [56(a)], its opponent must do more than simply

18  show that there is some metaphysical doubt as to the material facts. . . . [T]he

19  nonmoving party must come forward with 'specific facts showing that there is

20  a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 586–87 (1986) (internal citation omitted). When considering a motion for summary judgment, the Court does not weigh the evidence or assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## DISCUSSION

### A.  Section 1983 Claims Against Pullman Police Officers

#### 1.  Officers lacked probable cause to suspect Lankford of felony harassment.

Many of Defendants' arguments rest on their assertion that Pullman Police officers had probable cause to suspect Lankford of felony harassment. Therefore, as an initial matter, it is helpful to address whether Pullman Police officers had probable cause to suspect Lankford of felony harassment of Mikeala Marlow under Wash. Rev. Code (RCW) § 9A.46.020.  Under that statute, a person commits felony harassment if (1) he knowingly threatens to kill a person, and (2) the person threatened reasonably fears that the threat will be carried out. *Id.* The statute applies only to "true threats." *State v. Schaler*, 236 P.3d 858 (2010). A true threat is "a statement made in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted as a serious expression of intention to inflict bodily harm upon or take the life of another person." *Id.* (quoting *State v. Kilburn*, 84 P.3d 1215 (Wash. 2004)). The threat need not be direct

ORDER RULING ON
SUMMARY JUDGMENT MOTIONS **- 12**

and can be inferred based on the facts and circumstances. *State v. C.G.*, 80 P.3d 594 (Wash. 2003). The threatened person must find out about the threat, but it is not necessary that the defendant communicate the threat to the victim directly. *State v. J.M.*, 28 P.3d 720, 724 (Wash. 2001). Here, Lankford did not threaten to kill Mikeala Marlow, nor did he make any other true threat of which she was the subject. The only statement Lankford made potentially concerning Marlow occurred during a conversation between Lankford and his aunt. Lankford stated that he would like to find his former University of Idaho professor and "give him a piece of my mind." On its face, it is not at all clear that Marlow is the subject of the statement. Lankford uses the male pronoun "him" to refer to the professor, but Marlow is female. Lankford did not mention Marlow's name or any other identifying information except that the subject of the statement was a University of Idaho professor. The statement could apply equally to any University of Idaho professor who taught a class in which Lankford had been enrolled.

Taken alone, Lankford's statement is completely nonthreatening. The expression "give someone a piece of your mind" is a common expression used to assert an intent to confront another individual. While the expression has a negative connotation, it is not so closely related to violent activity as to constitute innuendo.

Even taken in context with Lankford's other statements, the statement still does not rise to the level of a threat. Lankford made many concerning statements in

his conversations with his mother and aunt. He expressed that he was resisting suicidal impulses, that he wanted his ex-girlfriend's head, that he wanted to wipe an individual off the face of the earth, that he wanted to pull the trigger and watch police officers' heads explode, and that he wanted to gun down individuals in the streets. However, none of these statements concerned Marlow. Lankford's other statements could reasonably cause an individual concern about what may happen if confronted by Lankford while he was in one of his agitated delusional states. However, Lankford's statement that he intended to confront a former University of Idaho professor cannot be reasonably interpreted as a serious expression of intent to kill Marlow.

### 2. Lankford's arrest was supported by probable cause.

"[I]f the facts support probable cause to arrest for one offense, the arrest is lawful even if the officer invoked, as the basis for the arrest, a different offense as to which probable cause was lacking." *See United States v. Magallon-Lopez*, 817 F.3d 671, 675 (9th Cir. 2016) (citing *Devenpeck v. Alford*, 543 U.S. 146, 153–55 (2004)). Officer Bray arrested Lankford on July 28, 2015, on suspicion of felony harassment of Mikeala Marlow. Lankford argues that the arrest was unconstitutional because officers lacked probable cause that Lankford engaged in felony harassment. Although Lankford is correct that officers lacked probable cause to arrest him for the offense of felony harassment, they had probable cause to arrest

him for possession of a controlled substance in violation of Wash. Rev. Code § 69.50.401. For that reason, Lankford's arrest was valid, and Defendants are entitled to summary judgment on any claims stemming from his arrest.

Under Wash. Rev. Code § 69.50.401, possession of usable marijuana in an amount exceeding one ounce is a Class C felony. When officers searched Lankford's hotel room, they found a significant quantity of marijuana in a pillowcase. Because the warrant authorized officers to search for ammunition, and the pillowcase could have contained guns or ammunition, the officers were legally justified in opening the pillowcase and looking inside. Based on Officer Gordon and Detective Dow's background, training, and experience, they concluded that the pillowcase contained at least one ounce of "usable" marijuana.

The fact that officers discovered the marijuana during a search that was later excluded does not impact the validity of the arrest for the purposes of this § 1983 claim. *Lingo v. City of Salem*, 832 F.3d 953, 959 (9th Cir. 2016) "'The lack of probable cause to . . . search does not vitiate the probable cause to arrest' on the basis of evidence found in that search." Lingo, 832 F.3d at 960 (quoting *Townes v. N.Y.C.*, 176 F.3d 138, 149 (2d Cir. 1999)). Probable cause therefore existed to arrest Lankford for violation of RCW § 69.50.401.

### 3. All officers except Officer Bray are entitled to qualified immunity from liability for the search of Lankford's hotel room.

Police officers are entitled to qualified immunity so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A police officer is also protected if it is objectively reasonable for the officer to believe that his or her acts do not violate constitutionally protected rights. Police activity conducted pursuant to a warrant rarely requires deep inquiry into reasonableness because a warrant issued by a magistrate normally suffices to establish that a law enforcement officer acted in good faith. *See Malley v. Briggs*, 475 U.S. 335, 344 (1986) (citing *United States v. Leon*, 468 U.S. 897, 922 (1984)). But "the officer's reliance on the magistrate's probable cause determination and on the technical sufficiency of the warrant he issues must be objectively reasonable." *Leon*, 468 U.S. at 922.

Even if a warrant is so lacking in probable cause that official reliance is unreasonable, not all officers executing the search are liable for the constitutional deficiency. *See KRL v. Estate of Moore*, 512 F.3d 1184, 1190 (9th Cir. 2008); *Ramirez v. Butte-Silver Bow Cty.*, 298 F.3d 1022, 1027 (9th Cir. 2002). In *Ramirez*, the Ninth Circuit recognized that "officers' roles can vary widely" and "[w]hat's reasonable for a particular officer depends on his role in the search." 298 F.3d at 1027. Officers who plan and lead a search "must actually read the warrant and

satisfy themselves that they understand its scope and limitations and that it is not defective in some obvious way." *Id.* (citing *Leon*, 468 U.S. at 922–23). Line officers, however, "do not have to actually read or even see the warrant, they may accept the word of their superiors that they have a warrant and that it is valid." *Id.* at 1028 (citing *Guerra v. Sutton*, 783 F.2d 1371, 1375 (9th Cir. 1986)).

Based upon these principles, each of the individual defendants is entitled to qualified immunity with respect to the search of Lankford's hotel room except for Officer Bray who drafted the search-warrant affidavit and should reasonable have known that the affidavit was insufficient to support probable cause for the crime of felony harassment.

### a.   Officer Bray

In a § 1983 lawsuit where the officer's request for a warrant allegedly caused an unconstitutional search, the test for qualified immunity is "whether a reasonably well-trained officer in [the officer's] position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant." *Malley*, 475 U.S. 344. If so, the officer's application for a warrant was not objectively reasonable and qualified immunity does not apply. The inquiry is objective, and an officer's duty to exercise sound judgment is not met simply because he lacks subjective bad faith.

Here, the Whitman County Superior Court correctly determined that the search of Lankford's hotel room was unconstitutional because the warrant was premised on an affidavit lacking sufficient evidence to support a probable cause determination. Officer Bray drafted the search warrant affidavit. ECF No. 67 at 7. The affidavit identified the crime of felony harassment under RCW § 9a.46.020. The affidavit included descriptions of various statements Lankford had made to his relatives including the following: "Lynch said that Lankford also stated on 7/25/15 that he wanted to find his professor at University of Idaho, Mikaela L Marlow, and giver her 'a piece of his mind.'" ECF No. 67-2. The affidavit did not mention that Marlow knew of the threats or that she was fearful for her life.

Under Washington law, felony harassment has two elements: (1) a defendant must threaten to kill another and (2) the subject of the threat must be placed in reasonable fear that the threat will be carried out. *See* RCW § 9A.46.020. The warrant affidavit here did not establish either prong. First, the warrant did not contain a statement that could reasonably be interpreted as a threat to kill Marlow. Second, the warrant contained no mention of Marlow's knowledge of the threats or her subjective fear. While there is some room for debate as to whether Lankford's statement regarding a former University of Idaho professor constituted a threat to kill Marlow, there is no dispute that the affidavit failed to establish the second element of the felony harassment offense.

This is not to say that all affidavits must contain information to support each element of every crime. *Cf. United States v. Thornton*, 710 F.2d 513, 515 (9th Cir. 1983) ("Probable cause does not require specific evidence of every element of an offense."). However, the crime of felony harassment is unique in several respects. First, and most importantly, the statute regulates speech, which must be closely guarded. *See J.M.*, 28 P.3d at 723. Second, the crime of felony harassment requires not just a threat, but a threat to kill. RCW § 9A.46.020(b)(ii). While there is ordinarily room for judgment and interpretation in what constitutes a threat towards one's person or property, the Washington State Legislature made clear that felony status attaches only in certain circumstances—such as when one threatens to take the life of another. Third, the statute expressly requires that the subject of the threat reasonably fear for his or her life. *Cf. J.M.*, 28 P.3d at 724 (noting that a primary purpose of anti-harassment statutes is to protect victims from the fear of violence and the disruption that fear engenders). Without this element, there is no crime.

A reasonable officer would have recognized that the affidavit was lacking in probable cause for the named offense and would not have believed that a warrant issued on the affidavit could be valid. To this point, Officer Winegardner expressed to Officer Sorem that he believed the probable cause booking sheet prepared by Officer Bray was insufficient to support the crime of felony harassment against Marlow. The probable cause booking sheet contained the same essential facts

provided in the search warrant affidavit, but provided additional context and detail regarding officers' conversations with Lankford's family members. The fact that Officer Winegardner was able to identify the flaw in Officer Bray's probable cause affidavit strongly suggests that a reasonable officer should have understood the warrant was not supported by probable cause.

Although Lankford implies that Officer Bray intended to deceive the judge in securing the warrant,[1] the Court emphasizes that it does not believe this to be the case. It is likely that Officer Bray acted in a manner that, at the time, he believed was reasonable and in accordance with the law. However, the analysis outlined in *Malley* requires an objective evaluation of the affidavit from the perspective of a reasonable, well-trained officer. And, on these facts, the Court must conclude that a reasonable officer would have known that the affidavit lacked probable cause for the stated offense. Accordingly, Officer Bray is not entitled to qualified immunity on Lankford's claim for unlawful search.

---

[1] It is not entirely clear from Plaintiff's briefing whether he intends to raise a separate, juridical deception argument. Plaintiff did not pursue this line of argument at the hearing. Nonetheless, the evidence in the record is insufficient to survive summary judgment on this claim because Lankford cannot make a substantial showing that any omission was deliberate. *See Lombardi v. City of El Cajon*, 117 F.3d 1117, 1124–26 (9th Cir. 1997).

### b.    Officer Gordon

Officer Gordon was Officer Bray's training officer. Officer Gordon asked Officer Bray to begin preparing a search warrant affidavit based on the crime of felony harassment. Officer Gordon initially assisted Officer Bray with the affidavit but left to respond to other duties. Officer Gordon believes that Officer Bray completed the affidavit with assistance from another Pullman Police Department officer. Officer Gordon was privy to the same information as Officer Bray. He knew of the statements that Lankford had made and that other officers had spoken to Marlow and reported that she seemed frightened by Lankford's statements. On these facts, the Court cannot say that any reasonable officer would have known that a warrant issued on these facts lacked probable cause. Unlike Officer Bray, Officer Gordon did not see the final affidavit for the search warrant application. He therefore had no reason to know that the affidavit lacked essential information. Accordingly, Officer Gordon is entitled to qualified immunity.

### c.    Officers Dow, Chamberlain, and Umbright

Officers Chamberlain and Dow assisted in executing the warrant. Officer Umbright did not participate in the search warrant application, but he responded to the Quality Inn to retrieve evidence recovered during the search. Plaintiff concedes that the record does not support liability with respect to these officers.

#### d.   Sgt. Sorem

Sgt. Sorem neither participated in the application for or execution of the search warrant. Sgt. Sorem's role in this case was limited to investigating the claims made by Bailey and contacting Lankford during the initial protective custody detention. Because Sgt. Sorem was not involved with the search warrant application or the resulting search, he is not liable for any constitutional violation stemming therefrom.

### B.   State Law Claims Against Pullman Police Officers

#### 1.   Lankford cannot make out a prima facie case for malicious prosecution.

Lankford asserts claims of malicious prosecution and false arrest and imprisonment based on his July 28, 2015 arrest. However, probable cause is a complete defense to a claim of malicious prosecution and false arrest and imprisonment. *See Bender v. City of Seattle,* 664 P.2d 492, 593 (Wash. 1983); *McBride v. Walla Walla Cty.*, 975 P.2d 1029, 1032 (Wash. 1998). Because Lankford's arrest was supported by probable cause, his claims fail.

#### 2.   Trespass and Conversion

Trespass is an intentional tort requiring plaintiff to prove "(1) an invasion of property affecting an interest in exclusive possession, (2) an intentional act, (3) reasonable foreseeability that the act would disturb the plaintiff's possessory interest and (4) actual and substantial damages." *Wallace v. Lewis Cty.*, 137 P.3d

101 (Wash. Ct. App. 2006). Conversion is the act of willfully interfering with any chattel, without lawful justification, whereby any person entitled thereto is deprived of possession. *Meyers Way Dev. Ltd. P'ship v. Univ. Sav. Bank*, 910 P.2d 1308 (Wash. Ct. App. 1996). Lankford can make out a prima facie claim for both trespass and conversion because officers entered his hotel room without lawful justification and interfered with and removed his personal belongings.

Like its federal counterpart, Washington State recognizes state law qualified immunity. An officer is immune from state liability when the officer "(1) carries out a statutory duty, (2) according to procedures dictated to him by statute and superiors and (3) acts reasonably." *Staats v. Brown*, 991 P.2d 625 (Wash. 2000). Here, all three elements are satisfied with respect to Officers Gordon, Dow, Chamberlain, Umbright, and Sorem. As discussed above, the officers acted in reasonable reliance upon the search warrant in searching Lankford's room for evidence of felony harassment. The officers are therefore protected by state law qualified immunity.

For the same reasons he is not entitled to federal qualified immunity, Officer Bray is not entitled to state law qualified immunity. Specifically, Officer Bray should have known that the search warrant was not based on probable cause and therefore did not authorize a valid search of Lankford's hotel room for evidence of felony harassment. Because Officer Bray should have known the

warrant was defective, he did not act reasonably according to state and federal law. Accordingly, he is not entitled to qualified immunity on Lankford's state law trespass and conversion claims.

**B.    Lankford's First Amendment Claim**

Lankford's complaint alleges only that Defendants Bray and Gordon violated his First Amendment rights by arresting him based on general discussions he had with his mother and aunt. In response to Defendants' motion for summary judgment, Lankford states only that his conversations with his mother and aunt were protected as free speech. "Conclusory statements without factual support are insufficient to defeat a motion for summary judgment." *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1103 (9th Cir. 2008). Defendants are therefore entitled to summary judgment on this claim.

**C.    Lankford's ADA and Rehabilitation Act Claims**

The Americans with Disabilities Act (ADA), 42 U.S.C. § 12132, applied to arrests that fall into two categories:

> (1) wrongful arrests, where police wrongly arrest someone with a disability because they misperceive the effects of that disability as criminal activity; and (2) reasonable accommodation, where, although police properly investigate and arrest a person with disability for a crime unrelated to that disability, they fail to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees.

*Sheehan v. City and Cty. of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014).

Lankford argues that he was wrongfully arrested because of legal conduct related to his disability. He states that he was arrested because he suffered from mental illness. As evidence of this, Lankford points to the fact that officers told Lankford that he would be arrested if he was not detained for mental health treatment. Even taking these facts in the light most favorable to Lankford's claim, the claim cannot succeed.

Lankford can point to no evidence that he was arrested because of his disability. He was instead arrested for conduct that officers believed constituted felony harassment. Lankford has not shown that his mental illness caused him to make threatening statements or hole himself up in a hotel room with guns, ammunition, and large quantities of marijuana. The officers' statements to Lankford regarding his arrest, even construed in the light most favorable to his claim, do not indicate that officers arrested him because of his disability. Officers merely informed Lankford of his status in custody and the course they planned to pursue if he were released. Accordingly, his claim under the ADA fails as a matter of law.

**D.    Lankford's *Monell* Claim**

Lankford asserts claims against the City of Pullman under respondeat superior and an independent claim for failure to adequately train officers on identification of probable cause and the lawful execution of search warrants. "[A] municipality cannot be held liable under § 1983 on a respondeat superior theory."

*Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978). Instead, a municipality is responsible for its officials' unconstitutional conduct under § 1983 only if the conduct was caused by a municipal policy, practice, or custom. *Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005). The Ninth Circuit has characterized the failure to train inquiry as a three part test wherein the plaintiff must show (1) the existing training program is inadequate; (2) the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need, and (3) the deliberate indifference was the cause of the constitutional deprivation at issue. *See Merritt v. Cty. of L.A.*, 875 F.2d 765, 770 (9th Cir. 1989) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). Lankford has not presented any evidence that the training programs are inadequate or that the city policymakers acted with deliberate indifference. Accordingly, the City of Pullman is entitled to summary judgment on Lankford's *Monell* claim.

Lankford's *Monell* claim fails at steps one and two of the *Merritt* analysis. First, Lankford has produced no evidence to show that the Pullman Police Department inadequately trains officers on the identification of probable cause or on the lawful execution of search warrants. Second, even if Lankford could show that officers received inadequate training, the record is entirely devoid of evidence

that any policymaker for the Pullman Police Department acted with deliberate indifference to a known need to train. Lankford has not illustrated a pattern of constitutional violations on probable cause assessments or the unlawful execution of search warrants. He has also produced no evidence of any policymaker's subjective knowledge. Accordingly, the evidence in the record is insufficient to support a *Monell* claim.

**E.    Lankford's Respondeat Superior Claims**

Lankford argues that, under the doctrine of respondeat superior, the City of Pullman is liable for the conduct of its police department employees. As discussed above, there is no respondeat superior liability under § 1983. This leaves only Lankford's state law claims for consideration.

Lankford cannot establish a prima facie case for his malicious prosecution and false arrest and imprisonment claims. However, he can make out a claim for trespass and conversion based on the Pullman Police Officers' search of his hotel room without a valid warrant. The Washington State Supreme Court recognizes respondeat superior liability against government entities. *See Savage v. State*, 899 P.2d 1270 (Wash. 1995). Accordingly, Lankford's claims for trespass and conversion against the City of Pullman survive.

Accordingly, **IT IS HEREBY ORDERED**:

1.  City of Pullman and Officer Joshua Bray, Officer Brian Chamberlain, Detective Todd Dow, Officer Alex Gordon, Sergeant Sam Sorem, and Officer Greg Umbright's Motion for Summary Judgment, **ECF No. 65**, is **GRANTED** in part and **DENIED** in part.

    *A.*  Defendants' motion is granted as to all claims against Officers Gordon, Dow, Chamberlain, Umbright, and Sorem.

    *B.*  Defendants' motion is granted as to all defendants on Lankford's First Amendment, ADA, and state law malicious prosecution and false imprisonment and arrest claims.

    *C.*  Defendants' motion is granted with respect to Lankford's *Monell* claim against the City of Pullman.

    *D.*  Defendants' motion is denied with respect to Officer Bray on Lankford's Fourth Amendment claim and state law claims for trespass and conversion.

    *E.*  Defendants' motion is denied as to Lankford's respondeat superior claims for trespass and conversion against the City of Pullman.

2.  Lankford's Motion for Partial Summary Judgment, **ECF No. 130**, is **GRANTED** in part and **DENIED** in part.

A.    Lankford's motion for summary judgment is denied as to his unconstitutional arrest claims.

B.    Lankford's motion for summary judgment on his unconstitutional search and seizure claims is granted with respect to Defendants Bray and Gordon and denied with respect to the remaining officers.

**IT IS SO ORDERED.**  The Clerk's Office is directed to enter this Order and provide copies to all counsel.

**DATED** this 1st day of March 2018.

_____
SALVADOR MENDOZA, JR.
United States District Judge